The Law Office of Olaf W. Hedberg
Olaf W. Hedberg, State Bar #151082
901 H St., Suite 301
Sacramento, California 95814
(916) 447-1192 office
ohedberg@yahoo.com

IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF

CALIFORNIA

| | |
|---|---|
| THE UNITED STAES OF AMERICA<br>V.<br><br>RUSLAN KIRILYUK | Case Number:  14-CR-83 DJC<br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**DATE: APRIL 18, 2024**<br>**TIME: 9 AM**<br>**DEPT: DJC** |

I. RECENT CHANGES TO USSG 4A.1. HAVE DECREASED DEFENDANT'S CRIMINAL

HISTORY SCORE

　　USSG 4A1.1 no longer increases by two points the Criminal History score for any person "…under any criminal justice sentence, including probation…" Now that increase only applies when a person has 7 or more points under subsection A. (USSG 4A1.1 (e).   Defendant has a subsection A score of one point. Therefore the two additional points described in PSI para. 53 no longer apply to Defendant. His proper Criminal History score should therefore be 1, resulting in placement in Criminal History category I.

II. THE LOSS CALCULATION MUST BE BASED UPON ACTUAL LOSS

In *United States v Banks* 55 F.4th 246 (3rd DCA 2022) the Third District Court of Appeals held that the use of the intended loss concept in determining loss pursuant to USSG 2B1.1 expands the meaning of the concept of loss beyond the plain meaning of the word loss as that word is used in USSG 2B1.1. As a result that Court held that only actual loss comes within the plain meaning of the word loss as that word is used in USSG 2B1.1.

> "Because the commentary expands the definition of "loss" by explaining that generally "loss is the greater of actual loss or intended loss," we accord the commentary no weight. Banks is thus entitled to be resentenced without the 12-point intended-loss enhancement in § 2B1." (*Banks*, at 258)

In so holding the *Banks* Court stated that:

> "If the Sentencing Commission's commentary sweeps more broadly than the plain language of the guideline it interprets, we must not reflexively defer. The judge's lodestar must remain the law's text, not what the [Sentencing] Commission says about that text." (*Banks*, at 256).

In so holding the Court reviewed relevant US Supreme Court authority, particularly the decision in *Kisor v Wilkie* 139 S.Ct 2400 (2019).

The *Banks* Court noted that Guideline 2B1.1 itself does not mention any actual/intended loss dichotomy (that language appears only in the Commentary) and stated that "That absence alone indicates that the Guideline does not include intended loss." (*Banks*, at 257).

In *Banks* the Court reviewed dictionary definitions of the word "loss" and found that there was no ambiguity as to the plain meaning of the word "loss" in USSG 2B1.1. As a result, the Court held, because the Commentary had included the concept of "intended loss" the Commentary had expanded the loss concept to include amounts not within the plain meaning of the Guideline. As a result the *Banks* court held that "we accord the commentary no weight." (*Banks*, at 258).

In its briefing the Government recognizes that the term "loss" is not defined in USSG 2B1.1. The Government claims that loss is defined in Application note 3 as "the greater of actual or intended loss". The Government then goes on the claim that the phrase "the greater of actual or intended loss" defines the term loss. The Government then asserts that the previously stated "definition" of loss is reasonable and assesses relative culpability. It does not.

The definition claimed by the government- "the greater of actual or intended loss" is circular and never actually informs us as to what loss itself is. By using the term loss to define loss the Commentary gives us circular argument that does not add anything to loss as it is used in Guideline 2B1.1-and is not a definition of loss. As a result the "intended loss" in Note 3 expands the concept beyond loss as it is used in Guideline 2D1.1.

Defendant contends that in addition to the *Banks* case the analysis that compelled the holding in the matter at bar (i.e. *United States v. Kirilyuk* 29 F3d. 1128 (9th Cir. 2002)) also compels a finding that the intended loss concept is not supported by the Sentencing Guidelines.

In this case the Ninth Circuit noted that 2B1.1 does not define loss-and that "In interpreting the Guidelines we apply the ordinary tools of statutory interpretation and look to the plain meaning of its terms." (*Kirilyuk*, at 1137). Because the Commentary expanded the definition of the word "loss" to include intended loss (a concept found nowhere in the Guideline itself) that Commentary is not binding on the Court.

Defendant objects to the use of any so-called "intended loss" concept. The holdings in *Banks* and *Kirilyuk* compel that the Court use the plain meaning of the word loss-and that the plain meaning does not include "intended" loss.

The loss in the matter at bar is therefore $1.4 million dollars.

## III. LEADERSHIP ROLE POINTS ARE NOT PROPERLY APPLIED AS TO DEFENDANT

Defendant reiterates his objection to the leadership role points and asserts the Government's procedural objection is not well taken. The Government has claimed that objection was not included in the PSI process any objection is invalid. That claim speaks past the underlying issues in this area, and does not reflect the procedural history of this case.

During the pendency of this case there has been much material filed regarding the leadership role attributed to Mr. Kirilyuk-including a full round of objection and briefs filed during the original sentencing process. Further, during the resentencing process a PSI was filed that, as regards the leadership role issue, is virtually identical to the previous PSI report. Clearly all previous objections are applicable here. Most importantly, Defendant also notes that the Government was able to compose a cogent and extensive briefing in this area.

In all his previous filings Defendant has objected extensively and vigorously to the addition of the leadership points. One area of particular note is the testimony of Akhmerov regarding the split of proceeds.

When speaking of the financial breakdown of the proceeds of the scheme Akhmerov testified at trial that Melkonyan received 30-40 %, None202 received 30%, he (Akhmerov) would receive 10-20% "And the rest would be taken by Ruslan." (See, Exhibit "A" Testimony of Ruslan Akhmerov R.T. II, p. 145, 15-22). Working through the math we see that according to Akhmerov there would be times when Mr. Kiriluyk's share would be the same as Akhmerov' and other times as low as 10%. No "leader" takes a smaller share.

Mr. Kirilyuk identifies the following 18 USC 3553 factors as relevant to the sentencing at bar:

## IV. THE NATURE AND CIRCUMSTANCES OF THE OFFNESE AND HISTORY AND CHARACTARISTICS OF MR. RUSLAN KIRILYUK

### A. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Defendant asserts that the arguments as to the leadership role are applicable here There is no basis to support the claim that Mr. Kirilyuk was in a leadership role.

### B. THE HISTORY AND CHARACTARISTICS OF MR. RUSLAN KIRILYUK

Ruslan Kirilyuk was born in 1978 in Ukraine. His parents were married and had two children— him and his sister Alice (now known as Alise). Alise if five years younger than Ruslan. Ruslan's mother's name is Alla Chimilima; his father's name is Aleksandr Kirilyuk.

When Ruslan was seven years old, the family moved to Siberia, where his father worked in a diamond mine. Subsequently, Ruslan's mother left his father. His parents divorced when Ruslan was nine years old (in approximately 1987). Ruslan's mother and sister then followed a man his mother married to Ukraine while Ruslan continued to live with his father.

Following the divorce, Ruslan spent summers in Ukraine at either a camp or his grandparents' home. He was close with his maternal grandfather. When Ruslan was a year old, his paternal grandfather was prosecuted for making bibles "underground". He was sentenced to jail in Siberia, where he remained for ten years.

After leaving Siberia, Ruslan and his father moved to Kiev, Ukraine for about eight months. While they were there, Ruslan's mother came to see him once.

Ruslan moved with his father and an uncle from what was then the Soviet Union to Sacramento when Ruslan was about 13 years old (circa 1991). He learned English after he moved to the United States.

Ruslan's father was very strict, but not abusive. He was a good dad. However, because he was raised by a single parent, Ruslan was sometimes neglected. He would do what he wanted as a child; his father drank a lot and was working. Ruslan's first job was delivering newspapers. He did that when he was 13 or 14 years old.

Ruslan couldn't understand why his mother didn't contact him. It was hard on him. After about 15 years without contact, he tracked down her phone number and called her in 2005. He tried to get an answer as to why she had just left his life, but he didn't get a satisfactory explanation; she just asked him to "leave the past behind". They had not communicated in approximately 15 years. Since then, they have had their "ups and downs", but they are on better terms now.

Ruslan worked in construction with his father for three months one summer in Atlanta, GA when he was a teenager. Ruslan first started drinking socially when he was about 17 or 18 years old, but not excessively. He graduated from Sacramento High School and subsequently enrolled in IT classes at American River College. He planned to be a computer programmer. He subsequently attended Sierra College in Rocklin, CA.

After high school, Ruslan worked as a commercial painter. When he was 20 years old, he fell three stories while painting a hospital in Modesto, severely injuring his back. He filed a workman's compensation claim. Ruslan was working on commercial painting jobs for Horizon Brothers Painting and Tricolor Development in the Sacramento area then. The companies were owned by Dimitri Rozakis and his nephew, Steve Paliodakis. Ruslan later worked for Signature Painting in 2003.

After high school, Ruslan met Inna Polischuck. Several years later, they got married. Ruslan was 21. Her parents are Alex and Oksana Polishchuck. Ruslan and Inna were together for 15 years. They owned a spa in the Sacramento area for a few years before moving to Los Angeles in 2007 so Inna could pursue a signing career. Everything was fine until about 2011, when they started having problems. She told him she didn't want to be married anymore, and they eventually divorced.

When Inna left, Ruslan became depressed and started drinking heavily. In about 2011, Ruslan Akhmerov, who was married to Alice, returned to California from Latvia. Ruslan was living with Akhmerov in an apartment on Coldwater Canyon Avenue in Los Angeles after he and Inna split up. Ruslan was depressed because of the split, and he was drinking a lot. He was "very careless" at that time.

Things spiraled downward for Ruslan during the time he was living with Akhmerov. Depressed about the end of his marriage Ruslan spiraled downward, drinking heavily. Ruslan and Akhmerov got into a fight about Ruslan's "worthlessness" and drunken behavior. Akhmerov got kicked out of the apartment.

After this Ruslan lived for a short period at a Motel 6 in the Hollywood area. Afterwards he moved to Orange County with Dana Bernik, her husband and children. At that time he had resumed working as a painter in the Orange County area. He lived there for about a year, and then moved out to the apartment he shared with his sister where he was living at the time of his arrest

Since this case went to trial Mr. Krilyuk was sent to FCI-Beaumont. At Beaumont he continued on his path to sobriety and self-improvement (see Documentation from FCI-Beaumont, attached as Exhibit "B").

Significantly an injury Mr. Kirilyuk suffered to his neck as a result of a fall while working as a painter began to worsen, and threatened his spinal cord. Defendant points out that

7

the type of health issues identified in Exhibit "C" will only serve to increase the punitive nature of prison-physical limitations that make it more difficult to move will make Mr. Kirilyuk's confinement time more difficult that a comparable sentence for a person without spinal cord issues.

## C. THE KINDS OF SENTENCE AND SENTENCING RANGE ESTABLISHED BY THE SENTENCING COMMISSION IN THE SENTENCING GUIDELINES

Note 21(C) of USSG 2B1.1 establishes that a downward departure is appropriate in the matter at bar. That Commentary states that:

> **"(C) Downward Departure Consideration.--**There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted.>
> For example, a securities fraud involving a fraudulent statement made publicly to the market may produce an aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims. In such a case, the loss table in subsection (b)(1) and the victims table in subsection (b)(2) may combine to produce an offense level that substantially overstates the seriousness of the offense. If so, a downward departure may be warranted.."

Mr. Kirilyuk points out that the example given as an example of a proper downward departure is on point with Mr. Kirilyuk's case. At bar is a fraud case that produces and aggregate loss amount that is substantial but diffuse, with relatively small loss amounts suffered by a relatively large number of victims. In this case, the loss tables produce an offense level that substantially overstates the seriousness of the offense. In this case a downward departure is warranted and supported by relevant Guidelines concepts.

Defendant suggests that a downward departure equivalent to the increase caused by the "intended loss" concept (8 points) is appropriate here. Also a downward departure equivalent to the increase caused by leadership points (4 points) is also appropriate. Therefore the appropriate downward departure is 12.

The above Guideline commentary establishes a means for the Court to make a downward departure and pass down a just sentence in the matter at bar.

### V. CONCLUSION

The Guidelines score set out at p.20 of the PSI is no longer accurate. The Criminal History category should now be I.

The 300 months requested by the Government is excessive. Even if the Court disregards all of Defendant's arguments the new Sentencing Guideline range (based on scores of 36, I) is now 188-235 months, exclusive of considerations involving Cts. 27 & 28.

Defendant asserts that the loss score is appropriately the actual loss, or $1.4 million dollars which adds 14 points to the base offense level of 7 (21).  The addition of points for 10+ victims (+2), Sophisticated Means (+2) Obstruction of Justice (+2) and Offense wile on Release (+3) produces an Offense Level of 30.  Defendant respectfully requests that the Court decline to add four points for a leadership role. Defendant also requests that the Court impose a sentence of one year for Count 28 (Failure to Appear).

Therefore Defendant respectfully request that the Court find that the Offense Level is 30, with a Criminal History category of I for a Guidelines range of 97-121 months. The Aggravated Identity Theft will then add 24 months and the Failure to Appear will add 12 months.

Defendant therefore respectfully requests that the Court hand down a sentence of 133 months in the matter at bar.

Dated: April 4, 2024                                          *Olaf W. Hedberg*
                                                                          Olaf W. Hedberg

9